Obviously, subject to the Court's questions, I want to try to cover three areas. The first area I want to cover is the issue of whether Northrop, whether in fact ever asked for $20 million policy year. The second point I want to cover is whether to point out the Northrop's contention that hurricane flooding is not excluded by the Factory Mutual Excess Policy, is not supported by either the policy language or, and is not objectively reasonable. Thirdly, I want to touch on the issue of concurrent cause. And with regard to concurrent cause, I want to make the point that if the Court agrees with us on the interpretation of the flood exclusion, regardless of what it decides on concurrent cause, it has to reverse the summary judgment. If concurrent cause doesn't apply or if the anti-concurrent cause language is enforceable, the judgment should be reversed with directions to enter judgment on the declaratory relief action in favor of Factory Mutual. If nonetheless the Court concludes that the concurrent cause doctrine is applicable, then there's a triable issue of fact as to which is the concurrent cause, and the case has to go back at a minimum for a trial to determine what was the efficient proximate cause of the loss. Now, as to the first point, did Northrop really ever request $20 billion in hurricane flood coverage? This seems to be the linchpin of its arguments. It argues that at page two of its brief, it states that he was concerned with and sought to ensure against catastrophic events, including California earthquakes and U.S. coastal storms, including flooding from those events. This is a fiction because the briefing booklet, which appears at pages 813 to 833 of the excerpts of record, this is the booklet prepared by Northrop's broker, Aon, which was submitted to the insurance market while requesting approximately $19.8 billion in total coverage, including a $500 million primary layer, specifically requested only $400 million in flood coverage and $400 million in earthquake coverage, and only $300 million in earthquake coverage in California, and an excess layer above $500 million that excluded both flood and earthquake. Now, Northrop now contends, as this Court is aware, that the specific wording of a flood exclusion encompasses hurricane flooding, but it's significant that in the submission to the insurance market, Aon, on behalf of Northrop, did not ask for any specific wording in the flood exclusion that it was requesting in the $19 plus billion excess layer. Moreover, the suggested premium for the primary layer was almost $13 billion, and for the $19.8 billion excess layer, the suggested premium is only $950,000. Moreover, if Northrop was seeking full coverage for hurricane flooding, it simply makes no sense that it would have asked for only $400 million in flood coverage in the primary layer, leaving a $100 million gap before the excess layer incepted. In fact, the reason that's the case is that as Northrop's executives, excuse me, the Aon executives, testified in this case, $400 million in flood coverage was the maximum available for what Northrop was willing to pay. Finally, to show that Northrop's contention that he was seeking basically unlimited earthquake and flood coverage, that makes no sense because while the briefing booklet requested only $400 million in earthquake coverage, the briefing booklet also stated that the probable maximum loss from earthquake was $557 million. That's at page 817 of the record. This is a request which is wholly inconsistent with Northrop's current contention that he was seeking full coverage for the catastrophic losses that it identifies in its brief. Now going to what the policy actually said, its contention that flooding caused by a hurricane was covered by the excess policy is simply unsupported by the policy language and is not objectively reasonable. The Louisiana Supreme Court recently stated in the Schur v. Lafayette insurance case that, and I quote, the entire English-speaking world recognizes that a flood is the overflow of a body of water causing a large amount of water to cover an area that is normally dry. That clearly describes what happened in Hurricane Katrina to the Pascagoula, Mississippi shipyard owned by Northrop's team. Immediately after Hurricane Katrina, its executives acknowledged in internal emails that the storm surge damage to its facilities constituted flood damage. So not only does the ordinary and popular meaning of flood encompass hurricane flooding, the evidence was uncontradicted that the custom and practice in the insurance industry is to treat hurricane flood coverage as flood damage. This was the conclusion of the deposition testimony of expert Andrew Braley. Now because the insurance industry treats flood as including hurricane storm surge, when AON made its proposal to the insurance market for $400 million in flood coverage in the primary layer and no coverage for flood in the excess layer, it must have known that the insurance market understood Northrop was not seeking coverage for hurricane flooding in the excess layer. Indeed, earlier following Hurricane Isabel, which occurred two years before Hurricane Katrina, and when Northrop was insured under a policy that contained an almost identical flood definition, Northrop segregated the damage caused by Hurricane Isabel between wind and flood damage, further confirming it had no reasonable expectation it was covered for storm surge damage under a policy that contained a flood exclusion in the factory. Council? Yes. What about that? I mean, when I looked through the record, I was puzzled by the fact that you had all this prior experience with floods and these two corporations going back and forth. But yet in the execution of this agreement, it seems like they walked in their closet and picked a policy here and a policy there, and they put them together, and they bought it and signed it, and nobody paid too much attention to it, nor did they modify it based on either one's expectation. How would you handle that? Well, because everybody had understood prior to this case that hurricane storm surge flooding constituted flood coverage. In terms of the two policies, the primary policy was actually drafted by Aon, Northrop's broker. It was the policy that there was an agreement between Factory Mutual and Aon that for clients policy was Factory Mutual standard policy, its advantage form that it typically used. So that's how the two policies came together. Now, I assume your honor is referring to the fact that the excess policy did not use the phrase, include the phrase, whether driven by wind or not, in its flood exclusion. But I submit that language is totally unnecessary because a flood is always caused by something. I'm sorry, I didn't mean to lead you there. I didn't assume that part. Okay. I was assuming the facts of how you form the agreement. Well, I was getting to that point anyway. But a flood is always caused by something. I mean, a flood doesn't happen spontaneously. It's always caused by, say, a heavy windstorm, a negligently designed dam or levee, or as in this case, it could be caused by an earthquake that causes a dam to fail. And even Northrop does not appear to argue that the any of those events. And I submit that it fails to persuasively explain why the exclusion nonetheless does not apply to a flood caused by a hurricane. In fact, the National Flood Insurance Program, which Northrop acknowledges covers hurricane flooding, simply covers flood. It doesn't say flood, whether driven by wind or not. If you needed the phrase, whether driven by wind or not, in the policy in order to make it clear or to establish that phrase, whether flood included hurricane storm surge, obviously the National Flood Insurance Program would have included that phrase. It did not, which simply confirms that that's the ordinary common understanding of that term. In fact, no case other than the unpublished Arizona District Court decision in the Pinnacle case, which is attached to Northrop's brief, which simply followed the district court's opinion here, holds that a flood exclusion does not encompass hurricane storm surge unless it uses the phrase, whether driven by wind or not. Now, unlike the insurers in the cases that Northrop has cited, such as the Safeco case or the Maxon case, we're not in this case arguing that the language, you know, certain language should be ignored in our exclusion. We're not arguing that language should be inserted in the exclusion. We're simply saying that the exclusion should be enforced simply as it's read, with no additions or omissions. Now, as to the concurrent cause issue, first of all, I don't believe that this is a case involving a concurrent cause. First of all, unlike all the concurrent cause cases you have here... Well, let me, before you get into that, let me ask you a question. The district court obviously didn't reach that issue. Yes. Why should we? Well, I mean, even if you're, even if you were to prevail on your coverage question, that issue is out there. And why not, why shouldn't it just go back and see what happens? Well, the way this developed, both parties moved for partial summary judgment on the declaratory relief cause of action. And we simply argued in our motion, well, the flood exclusion is plain and clear. It excludes this loss. It was in Factory Mutual's, excuse me, in Northrop's opposition to Factory Mutual's motion for summary judgment that it said, well, even if Factory Mutual is corrected by the flood exclusion, we still win because of, because the efficient proximate cause of the loss was the wind rather than the flooding. So that was the issue that was framed. The district court never reached that issue, as your Honor mentioned, simply because the district court concluded that the flood exclusion didn't apply here. So you're correct in that sense that it could go back to the district court, but we think, you know, it would be probably judicial economy would, you know, merit this court, since the facts are essentially undisputed, deciding it now so that there's not protracted litigation and a further appeal down the line. But, so I would suggest that, you know, this court should address the issue and rule in our favor on that. But as I said before, at the inception of my argument, it is our position that if we win on the flood exclusion, if the court agrees with us on that, under no circumstance can this summary judgment be affirmed. So just so I understand your position, if we go your way on the flood exclusion, that's the end of the inquiry. You don't get into the other doctrines that might affect this, right? Well, I don't believe that Northrop's position that the efficient proximate cause of this loss was wind rather than flood is correct, because I think there was only one cause of the loss in this case, and that was flood. All of the concurrent cause cases which have found that there was more than one cause of a loss are cases where you have an excluded peril and a covered peril that combined to cause a loss. And in some circumstances, the excluded peril could have occurred on its own, such as most of the concurrent cause cases involve policies that exclude earthquake or earth movement. And in some instances, earth movement can occur on its own, such as in a situation of an earthquake or an ancient landslide reactivates, or in, say, the Vonderleht case, California Supreme Court case, you could have a combination. You could have negligence that contributes to the earth movement, or you could have a pipe that could either deteriorate on its own or it could deteriorate due to somebody's negligence. But in this case, flood can never, as I mentioned before, flood can never happen on its own. It's always got to be caused by something. So if you say that the cause of the flood can be a concurrent cause, effectively, you're saying that the flood exclusion almost never would apply. I think this case is functionally identical to the Piper versus Commercial Underwriters case, where you had a policy that covered arson but excluded brush fire. And there was an arsonist who caused a brush fire, which destroyed the insured's home. And the insured argued, well, even though there was a brush fire, and even though that's excluded by the policy, the efficient proximate cause of the loss was the arson. And the California Court of Appeals said, no, that's not true, because fire always has some source of ignition. And if you're going to parse and try to divide the loss into components of the fire and the arson, then that makes no sense. That reads the exclusion out of the policy. And just as the cause of the brush fire in the Piper case could not be separated from the brush fire, the cause of the flood here can't really be separated from the flood. Otherwise, in order to have a flood exclusion, the exclusion would also have to exclude every potential cause of a flood. And that simply makes no sense. Now, so we don't think the concurrent cause doctrine even applies here. I would just briefly say that even if the court were to disagree, that we believe that under the governmental interest analysis that Mississippi law should govern this case, because Mississippi has the greatest interest in this case. And the Fifth Circuit recently, in two cases, has concluded that, by the way, I should go back on whether there was a concurrent cause here. The Fifth Circuit, in the In re Catrina Breaches case, relied specifically on the Piper case to hold that negligence in causing levees to fail after Hurricane Catrina was not a cause of loss and could not get around, could not allow the insurance to get around the flood exclusion in that policy. I think that Mississippi has the predominant interest because the damage here was to a shipyard in Mississippi that was owned by a Mississippi corporation, Northrop Grumman Ship Systems, which had its principal place of business in Mississippi. And the only connection that California has to this loss is the fact that California happens to be the location of the parent corporation of the company that actually owns the shipyard. And Mississippi, actually, the state of Mississippi actually leases the shipyard, part of the shipyard, to Northrop Grumman Ship Systems and requires that it be insured. And so Mississippi has, obviously, a clear interest in seeing that insurance is available in Mississippi for facilities like this. And if the courts were not to enforce policy exclusions, that would create a disincentive for insurers to write policies in Mississippi for locations like the shipyards in this case. And therefore, I submit that Mississippi has the predominant interest. I'm enjoying the balance of my time. Thank you. May it please the Court, good morning. Perk Passage for Northrop Grumman Corporation. It seems to me the basic starting point is this whole notion of storm surge and flood. When the broker submitted, and by the way, let's be clear about something. The Aon form that Mr. Abrams referred to was not an Aon form. It was correctly called a hybrid form, meaning Aon and FM together combined. There's no evidence in this record, because there is no evidence, that Northrop asked Aon to draft this form. The evidence is that Aon provided a form, it went to the market on behalf of various insurers, and that was a form that it offered for the Northrop program. But there's no evidence in the record that Northrop drafted it. Now, when you look at the Aon form, the hybrid, or you look at the global advantage form from FM, there's one point. There was a history between these parties. That's absolutely true. Different treatment on different hurricanes, storm surge exclusions and prior policies issued by this insurance company that were omitted from the policy at the excess level issued to Northrop, and the burden under California law rests on FM, not Northrop, to clarify an exclusion, to make it clear. Now, we're obviously aware of the National Flood Insurance Program. It's subject to its own rules of statutory interpretation. We're indisputably under California law on policy interpretation here. California law is clear. The burden is on FM to be clear, explicit, plain, conspicuous, whichever adjective you want to use in this exclusion. What FM never explains to this court, it did not explain to Judge Pragerson below, is why it left out whether driven by wind or not, and that is the time-honored phrase in the insurance industry for more than 90 years, when it is found in standard insurance policies issued by the leading insurance organization. This would be a simple case, and we wouldn't be here if FM had used those simple words, or if it had done what it did with Northrop's predecessor, Lytton, and included an exclusion for storm flute, which is storm surge. It elected not to follow 90 years of history. It elected not to use standard industry language. It elected not to use language it had used before, and now comes here to say all it needed to say was the word flood, because flood includes storm surge. But if you think about that, what they're asking this court to do is to rule that the rest of the flood definition is surplusage, because according to them, all you need to do is say flood is flood, and you know it includes storm surge and wave action and wind-driven water and overflow and all of those other things that specifically list item by item in the flood definition. It should have stopped at flood if that's what it meant, and it meant everything. Instead, it did the fairly standard definition omitting whether driven by wind or not. Now, I certainly agree that the Fifth Circuit has taken a different approach, but interestingly enough, there's no citation to a Fifth Circuit case or to any other case in the country, and I am aware of none since Judge Pragerson's decision that criticized or disagreed with the rationale used by Judge Pragerson. The subsequent Fifth Circuit decisions that paid any attention to it deal with it very quickly and don't say Judge Pragerson got it wrong. They talk about a different piece of language or different law. They don't disagree with the result. And, in fact, when you compare Mississippi and California law, and I was particularly interested in this point in their briefing and the omission of it here, we cited in our opposition brief at page 45 a California appellate decision called Gillis. Gillis was relied upon by the Mississippi Supreme Court two years later in Fireman's Fund Insurance Company of Newark, and this is an important point for our discussion. Gillis was the case where there was wind action, caused damage to a dock, it flipped the gangway over, gangway hit the dock, and then there was subsequent leakage and water damage. And the argument was where does efficient proximate causation fit in that mix? We believe Gillis is controlling here. FM relegates it to footnote 7. They summarize the Gillis holding. They basically say in one sentence, oh, but that's different from us because in our case the flood is the cause of damage. No explanation, no analysis whatsoever, and I submit it's because they cannot do it. When you look at Gillis, you have wind causing the gangway to flip and damage the dock. You then have subsequent wave action that causes flooding and the whole thing sinks. In that case, the California court found that it was wind-related, not flood-related. The Mississippi Supreme Court turns and looks at Gillis and says, cites it as one of the string of cases for the proposition that you look at cause and they found the cause there was driven by the wind. Okay, what does that mean here? Without the hurricane, this is indisputable too. I don't think even FM disagrees with this. No hurricane, no storm surge, no storm surge, no damage. We are not talking about some remote cause, which is the stuff that Prudential, LMI, and Garvey, the California Supreme Court, criticized this notion of how far back in time. Do you blame the woman who meets the man and they have a child and the child gets in an automobile accident later? That's remote cause. You could argue here that global warming is the remote cause of the damage. It's not the efficient proximate cause. In this case, we have a 100-mile-an-hour-driven, 15-foot wave of water that breaks land. I do not believe that the person standing there on the shore, that Fred would say to Ethel, look, Ethel, here's a flood coming at 100 miles an hour, 15 feet tall. That's not a layperson's understanding of flood. But we're not dealing with laypeople. We are dealing, admittedly, with two sophisticated corporations. The AIU case, the California Supreme Court, relegated the sophisticated insured exception to a footnote in the absence of evidence that the insured specifically negotiated and drafted the clause in question. That didn't happen here. This is an FM policy. It's form, it's advantage form. We didn't negotiate it. Why? Because we were clear in the documents provided. Yes, it was a big, fat volume, but the key piece was short, and we defined where storm surge fit, and we said it went in the wind analysis. Ms. Zweier knew that. She read it. She acknowledged it internally, and she said internally, without ever telling Aon or Northrop, that she disagreed with it. Now, if subjective intent means anything, in this case, we know that somebody at FM involved in underwriting the policy understood that we said storm surge is wind and didn't bother to tell us that they were going to take a different position. It may be fraud, but it's clearly some evidence internally of what they understood, and they knew the uncertainty. When the lead claims adjuster had taken the position earlier on a hurricane that it was wind, even though they now try to qualify it and explain why he didn't mean wind when he said wind, he meant flood when he said wind, not our issue to deal with. That burden is upon FM, not Northrop. Safeco is controlling here. McKinnon is controlling here. Let's talk, though, about this whole notion of where this fits. Mr. Abrams made a reference to a gap in coverage. There is no gap in coverage here. Never has been a gap in coverage. Northrop bought $400 million of flood coverage in the primary layer. We do not dispute that. We bought $500 million of wind and named wind storm coverage. And it is also not disputed that the primary policy clearly covers storm surge as named wind storm coverage. So the gap argument is an illusion based upon their starting point that all flood is flood and that storm surge is flood, and that's not true. The premium point merits the same consideration. We're dealing with an historic event here. FM made a bet, as did Northrop, that this historic event would not happen. It, according to the estimated premium, would collect a cool $850,000 for nothing. That was its bet. It spun the roulette, it bet, and it lost. The one thing that could happen that had never happened in history happened, and it got called upon to pay. Keep in mind, this is a company that, as the record shows, talks about all these loss control engineers who scour the face of the planet. They're the experts on loss control. They had probabilistic analyses, whatever those things are, projecting when things might happen, and one concern was would there be a storm of the century. We had the storm of the ages in Katrina. That's what we had, not the storm of the century. It's much more significant than that. They sold us an all-risk policy. It covers it. No hurricane, no storm surge. Now, Mr. Abrams made what I thought was a very interesting statement right at the start. His suggestion was we FM win, period, because if this thing is flagged, it's all over. That is simply wrong. I agree with you, Judge Reimer, that when Judge Kragerson didn't reach the issue, it should be remanded if that were the issue we were dealing with. But the reason is, and the reason I talked about the Gillis case out of California and the subsequent Mississippi cases that cite it, they distinguish between flood and wind. They recognize, and most of the Mississippi cases that both parties cite, draw a distinction and say there's a cause-based analysis you must apply. You have to look at how much of it comes from wind and how much of it comes from flood. If FM's dichotomy were right, that the water sitting there was flood and not storm surge, then you have to look at whether the wind-driven water, because that's what we're dealing with here, is wind-driven water. That initial wave, if that is something different than the water that stays behind, and I submit it is not under the policy's definition of occurrence, which treats all of this stuff and its material as one thing, but if there were a distinction between the water left behind and the initial 100-mile-an-hour 15-foot wave of water, that's a cause-based distinction which Judge Kragerson did not reach, and there would be an allocation issue as to how much of it was caused by wind, how much was caused by the 100-mile-an-hour moving wave of water, and how much of it was caused by whatever this water was that was left sitting there. That would be the cause-based analysis that would be up to the district court to do and was a proper basis had the court reached it to deny FM's motion. Now, the reason I said that we don't really have to go that far is because the policy itself is pretty clear on how it treats this sort of stuff. The policy obviously covers locations around the world, and by the way, this isn't Stonewall, which was a liability policy, and California courts have long recognized distinctions between property insurance and liability insurance, but even in Stonewall, the court said that California has a paramount interest in protecting its residents from tortfeasors. Well, Northrop has sued FM here for fraud and for tortious bad faith, so if there's a paramount interest in protection, it goes to the resident, which is Northrop. That's California's interest. The record is not well-developed on Mississippi interest. In fact, there's no factual evidence of Mississippi interest because it wasn't presented by FM. What we do know is only California has adopted a statutory scheme on efficient proximate cause and has a pretty well-established body of case law on that issue now. But if you look at the policy itself, in the supplemental excerpt of the record at page 10, there's the limits of liability section. It says limits of liability stated below apply in the aggregate per occurrence for all locations. They're grouping the locations together. We have Katrina damage in more than one state and in more than one location. That's one point where these folks elected to group everything together in the policy that they wrote, and then they sold to Northrop. They also had the option, had they wanted, to say what law would apply. They didn't put a choice of law clause in here. That was material in Stonewall. But it doesn't mean that FM was silent on choice of law. FM actually has a couple of places in its policy where it talks about the law of the jurisdiction where the property is located. One is on their contractual limitations period. That's the clause that says they have 12 months within which to file a suit. And in that clause, which is in the supplemental excerpt of record at page 40, it says if under the insurance laws of the jurisdiction in which the property is located, such 12-months limitation is invalid, then any such legal action needs to be started within the shortest limit of time permitted by such laws. So they recognized in that instance of contractual limitations where there might be a public policy or law, we're going to say refer to the local law. They didn't do it on anything that's relevant here. They also specified in the excerpt of record at page 43, they have a section called Provisions Applicable to Specific Jurisdictions. And they list, it starts at A, and it runs for several pages. It ends in K. They list different subparagraphs of where the local jurisdictions law will apply. And they say the company will provide, in subparagraph C, the insured copies of endorsements mandated for use by the laws of the states in the United States of America. The endorsements modify this policy with respect to any insured property located in the state in which the endorsement applies. No evidence offered by FM of any endorsement that modifies anything. The reality is they contracted with Northrop. They agreed to adjust the loss with Northrop, which is in Century City. They agreed to pay the loss to Northrop. They agreed to insure Northrop and treat all the damage at multiple locations as one occurrence. And now they would argue that notwithstanding that it's a single occurrence with a single payee, with a single party being negotiated, and notwithstanding that in a couple of instances they said the law of the local jurisdiction would apply, they didn't do it here. And they could have. California is the only jurisdiction that has a strong interest. They essentially ceded the choice of law issue to the district court. That was impermissible. It was their burden, just like it's their burden, to show that their policy exclusion is plain, clear, and unambiguous, and they didn't do it. Now, Mr. Abrams also said one statement, which was, everyone understood before this hurricane loss that storm surge was flood. I immediately pulled up pieces of the excerpt of record because I couldn't find the evidence that said that. What I found was evidence showing, at best for FM, conflicting interpretations based on the two prior hurricanes. I found the underwriting detail. I found Ms. Weyer's statements  she didn't agree with, but never told Northrop or Aeon. I found that evidence in the record. What I found was evidence that they didn't follow. And my question really is, why didn't they put storm surge in as an exclusion? If Ms. Weyer knew FM didn't want to cover it, and she knew our analyses all treated storm surge as named wind storm, why didn't they just put those two words in, or borrow the German word they used before storm flu, and put that in? Why did you pay for the policy that didn't have it in there? We paid for it because we distinguished between wind-driven, named wind storm-driven waves, storm surge, and other kinds of flood. We bought $400 million of what I would say is traditional flood coverage. As Mr. Brucker said, he thinks the flood is the river overflowing. We went for this policy language, and we went for it. It didn't have weather driven by wind or not. That was the time-honored language. It didn't have the storm flute exclusion that they had used before with us. They could have put that in there. They didn't say, we're not using named wind storm. And by the way, FM makes a big deal about Powering 2. Powering 2 is replete with references to two other policies, not just the stand-alone excess umbrella policies. And the key discussion in Powering is not under the umbrella part, it's under the stand-alone excess part. They refer to number one, the primary policies at issue there, and number two, the ISO standard form policy. And they repeatedly compare the excess policy with the ISO form policy. If you do that here, you get to the same result. They didn't use standard language, and they offered no explanation as to why not. This is their burden. If we were in a coverage-granting issue, we would have the burden. But it's their burden to frame their exclusion plainly and clearly. And I would submit, based on the specific history between these parties, their negotiations, the underwriting detail, on that basis alone, it's clear. If you interpret it in the context of the policies, and you look at their exclusion for buildings under construction, where they include whether driven by wind or not, they know how to use that phrase. They used it in their primary hybrid policy, they used it in another part in the very same policy. And then they don't use the ISO standard language that had been used for 90 years. We are not in Mississippi. We are in California. We had an event that impacted Mississippi, and it impacted Louisiana, and it impacted other places. This policy defines an occurrence as to all locations to be a single event. This policy defines the initial effect and the resulting damage or loss to be a single occurrence. We don't even have, and this is what I said earlier, we do not have to talk about efficient proximate cause, because this policy and its definitions doesn't mandate efficient proximate cause. It treats the initial peril and the resulting damage or loss by its expressed terms as a single loss and a single occurrence. Whatever else you can say about the water that was there, it clearly resulted from Katrina's winds. No winds, no water. I think at this point what I would simply say is this. We are not, in all fairness, on a level playing field, and we don't have to be. We win the tie. As long as our interpretation is reasonable, even if theirs is more reasonable, we win. That's the law in California, and whether we talk about efficient proximate cause or not, policy interpretation, they have conceded California law governs. McKinnon and Safeco expressed the public policy of this state. The public policy is to protect insurance, to force insurance companies to use reasonable, available language on the marketplace that's clearer. They cannot, under California law, say ignore everything in our flood definition, ignore the fact that we did not use clearer alternative language. Safeco and McKinnon do not give them that choice. Thank you. Thank you, Mr. Bessich, Mr. Egan. Thank you, Your Honor. An interpretation of the flood exclusion that says that flood doesn't mean flood coverage is not a reasonable interpretation, so our interpretation is the only reasonable interpretation. Now, there's a couple of points that have been made throughout this case which I think are totally erroneous and Northrop has been relying on them to ignore what the policy really says. The policy does not cover named windstorm as a separate peril. All that it covers, the primary policy, that's what we're talking about, the primary policy now. The primary policy does not cover named windstorm as a separate peril. And I think it's interesting because this is the gap argument that, well, we had $400 million in flood coverage, but there's no gap because we also had named windstorm coverage. If that were the case, the argument that we only requested $400 million in flood coverage, and the policy specifically said whether driven by wind or not, that's all superfluous because they didn't even need to look at that. They have the separate named windstorm peril. But all that the named windstorm language refers to is a deductible. The primary policy said that all damage caused by a named windstorm, which is including a hurricane, whether it's flood damage or windstorm damage, is part of a single $10 million deductible. That's all it said. It didn't create coverage that wouldn't otherwise exist. And certainly it doesn't mean that the excess policy which has a flood exclusion, the flood exclusion does not encompass hurricane flooding. Now, as to the statement in this natural loss analysis, the underwriting detail is this document. It's 470 pages long. The portion of the underwriting detail that dealt with Northrop's request for coverage is just the first few pages. Buried in the middle of that is a single statement which is part of the underwriting details prediction of probable maximum losses. And it goes through, you know, we could have this level of losses from hurricanes, from earthquakes, and what have you. And for purposes of this analysis, the document stated storm surge loss estimates are included in our storm analysis unless otherwise mentioned. Now, this did not say that when used in a policy the term flood did not include storm surge. It also did not say that Northrop wanted blanket coverage for storm surge under the excess policy. Now, according to counsel, Ms. Zoyer from Northrop supposedly saw that one statement. According to Northrop, she said that in her deposition, that she saw that statement and understood that Northrop believed that hurricane storm surge did not include flood. Well, that's not the case. If you read the deposition and recited the portions of her deposition in our record, she stated that she skimmed the entire 470-page document but that statement did not jump out at her. So the statement that she read that and understood that and believed that Northrop was requesting hurricane storm surge coverage in the excess policy is simply not borne out by the record. If the court has no questions, I'll submit. Thank you, counsel. Thank both of you. Thank you. It's a pleasure to hear arguments of this caliber. We really appreciate it. The matter just argued will be submitted and the court will be adjourned.
judges: Hall, Rymer, McNamee